# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JENNY RUBIN, et al.

v.                                                               01-1655(RMU)


THE ISLAMIC REPUBLIC OF IRAN, et al.


**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION TO EXAMINE AFFIANT AND FOR OTHER RELIEF**

## I.      BACKGROUND AND TRAVEL

On September 10, 2003, judgment was entered in this action pursuant to 28 U.S.C.

§1605(a)(7) against the Islamic Republic of Iran ("Iran") for $71,500,000.00 in compensatory

damages.  Rubin et al. v. Islamic Republic of Iran et al., 281 F. Supp.2d 258 (D.D.C. 2003).

Plaintiffs subsequently served the Bank of America with a writ of attachment on all

assets held by the bank belonging to Iran, accompanied by interrogatories. Bank of America filed

Answers to plaintiffs' interrogatories which identified four accounts in which Iran has an interest

("Iranian Accounts").

Bank of America asserted in its Answers, in reliance on previous decisions of this court,

that two of the Iranian Accounts (denominated by the bank as the "First Account" and the

"Second Account") are exempt from execution.

By contrast, Bank of America stated in its Answers that the funds in the two remaining

1

Iranian Accounts (denominated by the bank as the "Third Account" and the "Fourth Account") would be held by the bank pursuant to plaintiffs' attachment, pending further order of this Court.

Accordingly, plaintiffs then moved the Court for execution on the Third Account and the Fourth Account only,[1] which this court has previously determined to be subject to attachment and execution. Weinstein v. Iran, 274 F. Supp.2d 53 (D.D.C. 2003).

The United States has filed a Motion to Quash Plaintiffs' Writ of Attachment, supported by the Declaration of an official in the Department of State ("government affiant").

For the reasons stated below, plaintiffs request that the Court require the government affiant to appear to be examined on his Declaration.

## II.    THIS COURT'S HOLDING IN <u>WEINSTEIN V. IRAN</u>

Plaintiffs seek execution against the Third and Fourth Accounts pursuant to the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat. 2322 (2002) ("TRIA"). Section 201 of TRIA provides that:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) <u>shall be subject to execution or attachment in aid of execution</u> in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA §201(a) (emphasis added).

---

[1] Plaintiffs moved the Court to vacate without prejudice the writ of attachment in respect to the First and Second Accounts.

In <u>Weinstein</u>, plaintiffs holding a judgment against Iran under 28 U.S.C. §1605(a)(7) served Bank of America with attachments on the four Iranian Accounts.   The United States moved to quash the attachments, arguing that the Iranian Accounts are excluded from the definition of "blocked assets" under TRIA by the operation of §201(d)(2)(B)(ii) of TRIA.   That provision excludes from the definition of "blocked assets" property that is both:

1) "**subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations**"

<u>and</u>

2) "**being used exclusively for diplomatic or consular purposes**."

§201(d)(2)(B)(ii).

Judge Lamberth denied the government's motion to quash the attachments in respect to the Third and Fourth Accounts.   Judge Lamberth found that the Third and Fourth Accounts are neither "subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations" nor "being used exclusively for diplomatic or consular purposes," and expressly held that the Third and Fourth Accounts are blocked assets subject to attachment pursuant to §201 of TRIA.  <u>Weinstein</u>, 274 F. Supp.2d at 61-62.[2]

## III.   THE FACTUAL BASIS OF THE MOTION TO QUASH IS DEMONSTRABLY UNTRUE

---

[2] As explained in full detail in footnote 2 of plaintiffs' memorandum in support of their Motion Pursuant to Fed.R.Civ.P. 69(a) For a Writ of Execution, despite Judge Lamberth's favorable ruling regarding the Third and Fourth Accounts, the Weinstein plaintiffs were ultimately unable to execute on these accounts for reasons that are entirely inapposite to the instant plaintiffs.

Back for another bite at the apple, the United States has moved to quash the instant plaintiffs' attachments on the Third and Fourth Accounts.  The United States asserts that Judge Lamberth's decision in <u>Weinstein</u> was wrong, and argues once again that these accounts are both subject to the Vienna Conventions and being used exclusively for diplomatic or consular purposes and are therefore exempt from attachment under §201(d)(2)(B)(ii).  U.S. Memo at 9-13.

Though it concedes that the Third and Fourth Accounts have been blocked and lain absolutely dormant and unused for nearly two decades, the government argues that these accounts are "being used exclusively for diplomatic or consular purposes" since they "*<u>remained blocked</u> by the United States in <u>furtherance of its obligations</u> to 'protect and preserve' foreign government consular property*" under the Vienna Conventions. U.S. Memo at 11 (emphasis added).

In other words, the government is claiming that by <u>refraining from unblocking</u> these accounts, it is somehow furthering the fulfillment of its diplomatic obligations under the Vienna Conventions and that this inaction by the government -- not unblocking the accounts – constitutes "use" of the accounts for "diplomatic or consular purposes."

As plaintiffs will demonstrate in detail in their opposition to the motion to quash, this argument is, with all due respect, simply ludicrous as a matter of <u>law</u>.  The non-act of <u>refraining from unblocking</u> an asset cannot possibly constitute "use" of that asset.  Likewise, even if it were true that the government is keeping these accounts blocked in order to facilitate a diplomatic purpose, that would mean that the <u>blocking order is being "used"</u> by the United States to protect the accounts – and that the accounts themselves, which are merely the <u>object</u> of that protection,

are not being "used" at all.[3]

However, plaintiffs have also obtained strong evidence showing that the government's claims are baseless as a matter of <u>fact</u>.  The information available to plaintiffs indicates clearly that these accounts were and are not blocked for the purpose of furthering the United States' duties under the Vienna Conventions, but for other purposes entirely:

1) These accounts were blocked on November 14, 1979, together with all other Iranian assets under U.S. jurisdiction, under Executive Order 12170.  The accounts remain blocked exclusively under EO 12170; no other blocking order has been issued in respect to these accounts.  These accounts were blocked under EO 12170 because the President found that "*the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States.*"  <u>Id</u>. 44 F.R. 65729.  The White House announcement of EO 12170 stated that "*This order is in response to reports that the Government of Iran is about to withdraw its funds. The purpose of this order is to ensure that claims on Iran by the United States and its citizens are provided for in an orderly manner.*"  15 Presidential Documents (Part 2) 2117 (Nov. 14, 1979). The President's notice to Congress regarding the blocking order stated similarly that, "*Blocking property and property interest of the Government of Iran . . . will enable the United States to assure that these resources will be available to satisfy lawful claims of citizens and entities of the United States against the Government of Iran.*"  15 Presidential Documents (Part 2) 2118 (Nov. 14, 1979).

---

3 Plaintiffs will also dispute the government's claim that these accounts constitute property subject to the Vienna Conventions.

Thus, nothing in EO 12170 or the official documents indicating its purpose so much as hints that these accounts were blocked in order to further the fulfillment of the United States' duties under the Vienna Conventions.

2) Indeed, the United States' duty to respect and protect Iranian diplomatic and consular property under the Vienna Conventions arose only upon expulsion of the Iranian diplomatic corps in April 1980.  U.S. Memo at 4-5.  It is thus absurd to claim (as the government does) that these accounts were blocked in 1979 in furtherance of the Vienna Convention obligations which arose only subsequently, in 1980.

3) Even long after the United States' duty to respect and protect these properties under the Vienna Conventions had arisen, the United States continued to characterize the blocking of these assets as a "*response to [the seizure of the U.S. embassy in Tehran] and a threat by Iran to withdraw its assets from the United States . . . "* Brief for the United States in Opposition, 1991 WL 11178139 (U.S. July 24, 1991), Exhibit A, at 2.

Therefore, all facts available to the plaintiffs indicate that these accounts were and are blocked for purposes entirely unrelated to the government's Vienna Convention duties and that the government's claim to the contrary is simply not true.

Moreover, in a declaration submitted in <u>Weinstein</u>, the same government affiant, Mr. Taylor, explained at length that the government fulfills its obligations under the Vienna Convention in respect to Iran's diplomatic and consular property through the Office of Foreign Missions in the State Department ("OFM") using the powers granted it by the Foreign Missions Act ("FMA"), 22 U.S.C. §4301 *et seq*.  Declaration of Francis X. Taylor, January 31, 2003,

Exhibit B, §§ 3-4.

In his declaration in <u>Weinstein</u>, Mr. Taylor detailed how for over two decades the OFM has maintained custody over and managed Iran's diplomatic and consular properties, utilizing the broad powers granted it in the FMA.  <u>Id</u>. at §§ 8-37.  At the conclusion of his <u>Weinstein</u> declaration, Mr. Taylor told the court that the continued "custody" and "management" of Iran's diplomatic and consular properties – carried out under the FMA -- were essential to furthering the government's diplomatic duties under the Vienna Conventions:

> Continued U.S <u>custody</u> of Iran's diplomatic and consular properties and continued U.S. <u>management</u> of the real properties in furtherance of its obligation to protect these properties under the Vienna Conventions are essential to preserving the U.S. position on the current status of the diplomatic and consular properties of the two governments under the Conventions.

Declaration of Francis X. Taylor, January 31, 2003, at p. 16.  Exhibit B.

Thus, it is clear from the declaration submitted by Mr. Taylor in <u>Weinstein</u> that the United States fulfills its duties under the Vienna Convention utilizing the "custody" and "management" powers provided by the FMA – and that the blocking order plays no role whatsoever.

Yet, incredibly, the Declaration submitted by Mr. Taylor in support of the instant motion includes a passage identical to the above-quoted passage from the <u>Weinstein</u> declaration, **except that it makes no mention** of the "essential" role in furthering the government's diplomatic duties under the Vienna Conventions played by the continued U.S. "custody" and "management" of Iran's diplomatic and consular properties under the FMA.  Instead, the government affiant now suddenly claims that this "essential" diplomatic role is played by the "*Continued U.S.*

7

*blocking"* of these assets.  <u>See</u> Declaration p. 8.

Upon comparing the <u>Weinstein</u> version of this passage with the version appearing on page 8 of the Declaration submitted in support of the instant motion, it is glaringly apparent that the phrase "*Continued U.S. custody . . . "* was simply replaced with the phrase "*Continued U.S. blocking*," in an unfortunate and bad faith attempt to make the "facts" in the new Declaration fit the claims made in the government's motion.

## IV.    PLAINTIFFS ARE ENTITLED TO EXAMINE THE GOVERNMENT AFFIANT

As demonstrated above, the wholly conclusory claim made by the government's affiant as to the purpose of the blocking is not supported by a single whit of evidence and is contradicted by both the evidence mustered by the plaintiffs and a previous declaration made by the same affiant, all of which indicate that these accounts are blocked for reasons totally unrelated to the Vienna Conventions and that government fulfills its duties under the Vienna Conventions utilizing its custody and management powers under the FMA.

The government's factual claim that these accounts remained blocked in furtherance of its Vienna Convention duties, which is the *sine qua non* linchpin of its motion to quash, rests <u>exclusively</u> on Mr. Taylor's *ipse dixit* assertion that this is indeed so.  Plaintiffs have shown clearly that this key factual assertion is contradicted by all available evidence, including Mr. Taylor's own declaration in <u>Weinstein</u>.

In light of both the dispositive impact this factual assertion will have on the motion to quash and the strong evidence marshaled by plaintiffs on their own, plaintiffs are entitled and should be permitted to examine the government affiant.  Specifically, plaintiffs should be given a

fair and full opportunity to demonstrate, by examining the affiant, that his unsupported claim regarding the purpose of the blocking is wholly baseless as a matter of fact.

A party that presents a well-supported challenge to unsupported factual claims by a government affiant should be permitted to examine that affiant and settled the disputed factual issue.  See Hegna v. Islamic Republic of Iran, 376 F.3d 485, 493 (5th Cir. 2004) (party holding terrorism judgment against Iran under 28 U.S.C. §1605(a)(7) denied evidentiary hearing in respect to factual claims made by government affiant on sole ground that party did not dispute the substance of affiant's declaration).

Indeed, in Hegna, the Fifth Circuit sharply criticized the government for failing to provide documentary or other support for a factual declaration made by another official of the State Department, and held that factual questions dispositive of legitimate efforts by victims of terrorism to satisfy their judgment should not be decided on the basis of bald assertions by government affiants:

> We wonder why the United States could not have offered some documentation to support [its affiant's] declaration. Presumably, some formal document exists to report the proceedings of the Claims Tribunal.  When a family's ability to satisfy a legitimate judgment depends on the status of a piece of property, and when that status requires evidence to make a determination, it is preferable for the government to include more than a declaration from one of its own employees.

Hegna, 376 F.3d at 493, note 29, (emphasis added).

Here, unlike in Hegna, plaintiffs have done far more than merely challenge the substance of the government declaration: they have made a strong affirmative showing that the government's factual claims are not correct.

9

Plaintiffs' "*ability to satisfy a legitimate judgment*" arising from a brutal act of terrorism should not rise or fall on their limited ability to gather from the public record evidence refuting the factual claims of the government.  Rather, plaintiffs should be permitted to test the government's claim directly by examining its affiant.

## V.    CONCLUSION

For the reasons stated above plaintiffs' motion should be granted.


Plaintiffs, by their attorneys,


_____/S/_____
David J. Strachman
McIntyre, Tate, Lynch & Holt
321 South Main Street, Suite 400
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)